IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| RONNIE G. TURNBILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CV-347 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 17] will be granted, and plaintiff's motion for summary judgment [doc. 13] will be denied.

I.

*Procedural History*

Plaintiff was born in 1969. He applied for benefits in January 2007, alleging a disability onset date of November 15, 2005, due to anxiety, depression, hepatitis, hypertension, and "back injury." [Tr. 118, 123, 138]. The applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an

Administrative Law Judge ("ALJ") in March 2009.

In May 2009, the ALJ issued a decision denying benefits. The ALJ concluded that plaintiff suffers from "status post left forefinger ray amputation; seizure disorder, in remission with prescribed medication; history of migraine headaches; back pain; history of alcohol and drug abuse in self-reported recent remission; borderline intellectual functioning; depression and anxiety," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 12-13]. The ALJ found plaintiff to have a residual functional capacity ("RFC") for a range of light exertion restricted by: lifting no more than five pounds with the left hand; no fingering or fine dexterity with the left hand; an option to change positions every hour; and no "complex work, relating more than superficially with others, and performing work with strict production standards." [Tr. 14].

The ALJ found plaintiff's subjective complaints to be "less than fully credible," citing: plaintiff's activity level; inconsistent statements found throughout the record; and evidence "that the claimant has not been entirely truthful with regard to his polysubstance abuse, which detracts from the claimant's general credibility as it calls into question his veracity with regard to his other statements." [Tr. 18-19]. Relying on vocational expert ("VE") testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the local and national economies. [Tr. 20]. The ALJ thus concluded that plaintiff is not disabled.

2

Plaintiff then sought review from the Commissioner's Appeals Council. That request was denied despite plaintiff's submission of more than 50 pages of additional medical records. [Tr. 1, 4].[1] The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481.

Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g). On appeal, he argues that the ALJ erred by not adopting the opinion of his treating physician and by not finding that he satisfies the Commissioner's mental retardation listing.

## II.

### *Relevant Background*

### A. <u>Personal</u>

Plaintiff claims that sitting for more than an hour causes lower back pain. [Tr. 33]. He further alleges a host of problems including dizzy spells, migraines, anxiety, depression, and impaired memory. [Tr. 34, 36].

On November 1, 2005 (shortly before the alleged disability onset date), plaintiff told a physician that he was taking time off from work to "fix up his house." [Tr. 367]. The following month, plaintiff was "still working on his own house" but told the same physician that he had been "laid off from work until about March because of the weather."

---

[1] Plaintiff's additional documents [Tr. 800-55] are not discussed in his brief and thus are not an issue on appeal. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

[Tr. 365]. However, in December 2006, plaintiff told a counselor that he "lost his job *two years ago due to health problems*." [Tr. 473] (emphasis added). Since the alleged disability onset date, the administrative record additionally reveals that plaintiff has gone skiing, used a weed eater for two hours, plowed a garden, and engaged in significant drug and alcohol abuse. [Tr. 263, 359, 794].

## B. Substance Abuse

As mentioned above, the ALJ found "that the claimant has not been entirely truthful with regard to his polysubstance abuse, which detracts from the claimant's general credibility as it calls into question his veracity with regard to his other statements." [Tr. 18-19]. At the administrative hearing, the ALJ advised plaintiff:

> I'll be honest with you, sir, I'm not sure you're being honest with me today. . . . I'll just tell you flat out I'm not – I don't know you and I'm not wanting to hurt your feelings or be unkind, but I'm not entirely sure you're being credible and that may spill over into other areas as well. That's just – you can see from the record there's some conflicts there.

[Tr. 30]. The court could not agree more with the ALJ's observations. In light of the troubling number of inconsistencies present in the record, the following chronology is noted:

> - July 20, 1986 - Shortly after plaintiff's seventeenth birthday, a counseling discharge summary from Ridgeview Psychiatric Hospital and Center ("Ridgeview") noted a "*history of significant* cannabis and [alcohol] abuse." [Tr. 232] (emphasis added).

> - 1997 - Plaintiff stopped working at Acme Block. [Tr. 218]. He later disclosed that he was fired for smoking marijuana on the job. [Tr. 794].

4

- <u>January 15, 2004</u> - To Dr. Douglas Dewar, plaintiff was pleased with the benefits of his anti-anxiety and narcotic pain medications. He denied abusing either drug. [Tr. 408].

- <u>March through December, 2004</u> - To Dr. Dewar, plaintiff continued to deny abuse of prescription medications, "any illegal substance," or attempts to obtain narcotics from another doctor. [Tr. 384, 390, 394, 396, 402, 404, 406].

- <u>August 24, 2004</u> - To Dr. Dewar, plaintiff reported that he was "stressed with family problems" because his brother had borrowed his truck and then set it on fire, "ruining" the truck and another vehicle. [Tr. 400].

- <u>November 1, 2004</u> - To Dr. Arnel Panelo, plaintiff described himself as "an occasional beer drinker." He denied intravenous drug use. [Tr. 235]. However, to another source in January 2007, plaintiff admitted a 12-year history of intravenous cocaine use. [Tr. 461].

- <u>February through April 2005</u> - To Dr. Dewar, plaintiff continued to deny abusing his prescription medications or "having any illegal drugs." [Tr. 380, 382].

- <u>June 16, 2005</u> - Plaintiff sought additional pain medications from Dr. Dewar, who "[a]dvised him I could not give him any more pain medicines for a week. He was unhappy with this but I told him if he took them early then he would appear to be a drug abuser and then he would run in[to] trouble with the law." [Tr. 376].

- <u>July through December 2005</u> - To Dr. Dewar, plaintiff continued to deny abusing his prescription medications, "getting medications from other doctors," or "using illegal drugs." [Tr. 367, 372, 374].

- <u>May 2, 2006</u> - Claiming to be disabled by an ingrown toenail, plaintiff sought additional pain medications from Dr. Dewar but was told that he was "about 6 weeks early" for a refill. Plaintiff refused non-narcotic treatment options. [Tr. 361].

- <u>June 19, 2006</u> - Plaintiff sought and obtained narcotic refills from Dr. Dewar. A drug screen that date came back positive for cocaine, causing Dr. Dewar to discharge plaintiff from his practice (with the notation that he is "able to work."). [Tr. 357, 359].

5

- <u>August 22, 2006</u> - Plaintiff told Dr. Panelo that he "used to see Dr. Dewar but *quit* going to him about 3 months ago." [Tr. 264] (emphasis added).

- <u>August 23, 2006</u> - Plaintiff told Dr. Wael Abo-Auda that he does not use alcohol but that "he used cocaine about one year ago." [Tr. 267].

- <u>October 26, 2006</u> - Plaintiff sought treatment at Roane Medical Center Emergency Department ("Roane Medical") for "the worst headache of his life." Plaintiff denied use of alcohol or drugs. [Tr. 331].

- <u>November 23, 2006</u> - Plaintiff sought treatment at Roane Medical for the "worst headache he's ever had." Plaintiff denied use of alcohol or drugs. [Tr. 319].

- <u>December 5, 2006</u> - Seeking treatment for an alleged migraine, plaintiff again told Roane Medical staff that he does not use alcohol or drugs. [Tr. 293].

- <u>December 18, 2006</u> - Plaintiff appeared at Roane Medical claiming to be suicidal and depressed because of his cocaine abuse. [Tr. 300]. He tested positive for cocaine, opiates, marijuana, barbituates, benzodiazepines, and tricyclic antidepressants. [Tr. 305]. He reported "off and on" use of cocaine for the last ten years, having consumed $60 worth that day and $300-$400 worth the week before. [Tr. 312]. He had paid for the drugs in part by telling his wife to give him money "because he wanted to buy her a present." [Tr. 312].

- <u>December 19, 2006</u> - Plaintiff was admitted to Peninsula Psychiatric Hospital ("Peninsula"). Dr. Arun Jethanandani described plaintiff as "very uncooperative." Plaintiff purportedly had no idea why barbituates and tricyclic antidepressants were present in his system, and he explained that his positive marijuana screen was simply a result of "being in the car with other people smoking marijuana." [Tr. 349]. Plaintiff allegedly had stopped daily use of alcohol in mid-2006 and daily cocaine use in October 2006. [Tr. 349]. Dr. Jethanandani opined that plaintiff was "minimizing his substance abuse history and does not appear to have much insight into his psychopathology. . . . [He] is not willing to address his issues and receive treatment." [Tr. 351].

6

- <u>January 5, 2007</u> - Plaintiff told Ridgeview staff that he was currently using one to two grams of methamphetamine per day and consuming "cases" of alcohol daily. He claimed that his only marijuana use was as a teenager, and that he had only used cocaine <u>one time in his life</u> - on the preceding Sunday. [Tr. 474].

- <u>August 12, 2007</u> - Plaintiff told Roane Medical staff that he does not use alcohol or illegal drugs. [Tr. 755].

- <u>November 12, 2007</u> - To Dr. Abo-Auda, plaintiff denied alcohol and illegal drug use. [Tr. 588].

- <u>November 15, 2007</u> - To Dr. Jose Valedon, plaintiff again reported that his truck had burned - not in 2004, but in the prior week. Plaintiff claimed that his narcotic medications were lost in the fire because "he kept his medications in his truck." [Tr. 591].[2] According to plaintiff, his wife obtained replacement narcotic prescriptions for him after the fire [Tr. 591], and that is confirmed in the records of treating physician Mancel Wakham. [Tr. 655].

- <u>November 15, 2007</u> - Still in consultation with Dr. Valedon, plaintiff stated that he stopped drinking alcohol <u>in 1998</u>. He also "adamantly denie[d]" recent marijuana use, notwithstanding a drug screen that was positive for marijuana that day. [Tr. 591].

- <u>February 18, 2008</u> - To Dr. Clement Block, plaintiff admitted past intravenous drug use but denied current consumption of alcohol. [Tr. 711].

- <u>February 25, 2008</u> - Dr. Abo-Auda's office called Dr. Wakham's office to report that plaintiff had appeared that day seeking additional prescriptions from Dr. Abo-Auda for Xanax and Percocet. Dr. Abo-Auda is a cardiologist, and the record shows it is treating physician Wakham who provides plaintiff's Xanax and Percocet prescriptions. Dr. Wakham's staff noted that Dr. Abo-Auda's office "just wanted us to be aware of this." Dr. Wakham's records from that day go on to reveal that plaintiff and his wife "have a diff[erent] story. They told them that they had refills." [Tr. 644].

---

[2] In addition to straining the limits of believability, this contention - that plaintiff stores his narcotic medications in his truck - is inconsistent with his administrative hearing testimony. Plaintiff testified that it is his wife who obtains his medications from the pharmacy and that it is she who sets out his pills for him on either a daily or weekly basis. [Tr. 29].

- <u>March 27, 2008</u> - Another drug screen was positive for marijuana. [Tr. 703].

- <u>April 8, 2008</u> - Plaintiff again told Dr. Block that he does not use alcohol. Dr. Block "remain[ed] puzzled" by plaintiff's complaints of abdominal pain. [Tr. 696].

- <u>April 14, 2008</u> - Six days after again telling Dr. Block that he does not consume alcohol, plaintiff told Dr. Philip McDowell that he uses alcohol daily. [Tr. 625].

- <u>March 5, 2009</u> - At the administrative hearing, plaintiff testified that he had not used alcohol, marijuana, or cocaine "in a couple of years." [Tr. 29]. Plaintiff's wife testified that she had not witnessed any problems with alcohol or drugs within the prior year. [Tr. 39]. She further testified that plaintiff had not used cocaine since the December 2006 hospitalization, and that his marijuana usage had just been "kind of a temporary thing." [Tr. 39-40].[3]

- <u>April 22, 2009</u> - To a psychological examiner, plaintiff admitted a history of alcohol abuse but denied any consumption within the prior year and a half. He further denied using marijuana since he was a juvenile. According to the examiner, plaintiff "at first denied any other drug uses [but] later admitted that he had abused cocaine which was less than a year ago and reported specifically that he had used it on a daily basis for one month." [Tr. 793].

On a somewhat related note, plaintiff's credibility is further diminished by his failure to ever *attempt* to get a drivers license - even though he owns and/or maintains vehicles [Tr. 124, 400, 655], drives a motorcycle [Tr. 400], was self-employed (with no employees) from 1999 through 2003 transporting stones by truck [Tr. 46, 139, 149], and has a history of DUI arrests and traffic citations [Tr. 350, 792]. The ALJ asked plaintiff why he has never obtained a license (which, of course, is required by law for all drivers). Plaintiff

---

[3] The wife stated that the hospitalization was in December 200<u>7</u>, but she was admittedly uncertain about the year. [Tr. 40]. From the record, it is clear that her testimony pertained to the 200<u>6</u> Peninsula/Ridgeview episode.

replied, "Just ain't never went and got it and now I've got all the problems." [Tr. 26].

## C. Psychological / Intellectual

Clinical psychologist H. Abraham Brietstein conducted psychological and intelligence testing in August 1983, when plaintiff was 14 years old. [Tr. 224]. Plaintiff "attained a verbal IQ of 64, performance IQ of 80 and full scale IQ of 70." [Tr. 224]. Dr. Brietstein wrote,

> Educationally, he is performing extremely poorly in all areas. . . . [H]e is severely delayed in all academic areas and is well below his present grade placement without any apparent academic strengths.
>
> On the other hand, [plaintiff] appears socially mature, and at home and in the community he functions in nearly an age appropriate manner. . . . [H]e is allowed a great deal of freedom, going nearby places alone and unsupervised during the daytime. In fact, in light of the trouble that [he] has gotten into [by age 14 he was already on probation], it would appear as if he needs more and closer supervision at home before his behavior gets him into further conflicts with the law.
>
> . . . The test results indicate that he has a severe learning disability which affects especially his language skills . . . . There is a significant discrepancy between his innate, nonverbal abilities which are nearly average and his acquired, verbal abilities, which are severely limited. In addition, there is a wide discrepancy between his nonverbal abilities and his educational achievement in the areas of reading, writing and mathematical computation. All of these make it unlikely that he could be successful at a regular high school and also present a significant barrier to his future employment.

[Tr. 225].

Less than three years later, the July 1986 Ridgeview counseling summary, as mentioned above, noted a "*history of significant*" marijuana and alcohol abuse. [Tr. 232] (emphasis added). The counselor additionally wrote that plaintiff "appeared to function in

9

the level of low average IQ intellectually." [Tr. 232]. Similarly, following a December 2006 mental status examination, Dr. Jethanandani wrote that plaintiff "appears to be of low average intelligence." [Tr. 351]. In August 2007, consulting neurologist Bruce LeForce observed that plaintiff's "[l]anguage, memory, concentration, and fund of knowledge appear generally intact." [Tr. 568].

Nonexamining Dr. Richard Gann completed a Mental RFC Assessment form in March 2007. Dr. Gann opined that plaintiff would be "moderately" limited in six vocational capacities, but he predicted no "marked" limitation. [Tr. 499-501]. In Dr. Gann's opinion, plaintiff's "functional limitations do not suggest a severe cognitive impairment. . . . The evidence indicates that the claimant's primary mental impairment is . . . continued drug abuse." [Tr. 497]. Nonexamining source Rebecca Joslin, Ed.D. completed a Mental RFC Assessment in October 2007, predicting "moderate" limitation in five areas but no "marked" restriction. [Tr. 584-86]. Like Dr. Gann, Dr. Joslin noted plaintiff's long history of polysubstance abuse. [Tr. 582].

At the administrative hearing, the ALJ announced that he was ordering additional psychological evaluation. He made clear to plaintiff's counsel,

> I think you should caution the claimant that he needs to be as cooperative as he can with the testing. When he was treated, of course he was having the drug issues when he was treated at Ridgeview, and you know, when you're using drugs, it's a little hard. Sometime you're irritable and whatever, and I understand that, but when they started treating there, they said he was very uncooperative and maybe he didn't want to be there . . . .
>
> . . .

10

. . . I'm just saying if he's got a history of poor cooperation, it may be related entirely to drugs rather than the way he normally is. Or it may not. I don't know. But I'm just suggesting he needs to cooperate with testing . . . . [A]nd so all I'm suggesting is that, you know, the testing won't be real helpful if he doesn't cooperate. And so I would, you know, urge him or caution him to be cooperative with testing.

[Tr. 56-57].

An evaluation was then performed on April 22, 2009, by senior psychological examiner Stephen Hardison, M.A. Intelligence testing was within the mental retardation range for verbal comprehension, working memory, and full scale IQ. [Tr. 795]. However, Mr. Hardison remarked that plaintiff "tended to respond at times rather quickly that he did not know an answer and based on the obtained history, it is felt he may be capable of functioning within the borderline range intellectually." [Tr. 795]. The results of personality testing were very likely invalid and were "interpreted very cautiously and . . . considered very questionable" due to likely "exaggeration of symptoms." [Tr. 795].

Mr. Hardison opined that plaintiff would be moderately limited in understanding, remembering, and carrying out complex instructions and in making complex work-related decisions. He further predicted that plaintiff would be mildly to moderately limited in interacting appropriately with the public. Mr. Hardison wrote that plaintiff "reports abstinence from substances." [Tr. 789-91].

11

D. <u>Physical and Treating Physician</u>

Plaintiff claims to be disabled in part by hepatitis. [Tr. 138]. He was treated for viral hepatitis in November 2004, which Dr. Panelo opined would "keep him out of work for 1 week." [Tr. 233-34]. Plaintiff was subsequently told that he no longer has active hepatitis. [Tr. 711].

Plaintiff sought medical care for chest pain in August 2006, nine months after his alleged disability onset date. Plaintiff reported that he "had been doing the weed eating for about 2 hours before the incident happened." [Tr. 263]. He "had been walking all day in the sun." [Tr. 267]. Dr. Abo-Auda opined that plaintiff's complaints were secondary to "heat exhaustion and dehydration." [Tr. 263].

Plaintiff has sought treatment for alleged migraines. [Tr. 293, 319, 331].[4] He underwent an "uneventful excision" of a large membrane from his right eye in December 2006. [Tr. 286]. In August 2007, consulting neurologist LeForce wrote that plaintiff's complaints "meet the clinical criteria for migraine without aura." [Tr. 568].

In November 2004, plaintiff complained to Dr. Dewar of worsening low "8/10" back pain requiring the use of up to ten Percocets per day. [Tr. 388]. Although he was aware of a "negative" lumbar x-ray, Dr. Dewar added a prescription for oxycodone. [Tr. 388]. June 2005 lumbar imaging was again "normal" with good height and alignment. [Tr. 261].

---

[4] As noted above, several alleged migraines arose during an (eventually) admitted cocaine binge. [Tr. 293, 319, 331].

12

Shortly after his cocaine-related discharge from Dr. Dewar's practice, plaintiff began treatment in September 2006 with his family's physician, Dr. Mancel Wakham. [Tr. 455]. Plaintiff claimed to suffer chronic back pain, hypertension, and anxiety. [Tr. 455].

Nonexamining Drs. Joel Dascal and Marvin Cohn completed Physical RFC Assessment forms in March 2007 and November 2007, respectively. [Tr. 503-10, 601-08]. Each source predicted that plaintiff could perform nearly the full range of medium work. Plaintiff reported new physical complaints after these assessments were submitted. The ALJ assigned "little weight" to the assessments, "giving the claimant the benefit of [the] doubt." [Tr. 18].

In November 2007, plaintiff sought treatment for an alleged episode of chest pain and loss of consciousness. [Tr. 588]. Dr. Abo-Auda thought the episode might be seizure-related. [Tr. 589]. Plaintiff was evaluated three days later by Dr. Valedon who speculated that the purported seizures were secondary to recent discontinuation of a heart medication. [Tr. 594]. At the administrative hearing, plaintiff testified that his current seizure medicine causes him no problems, and that he had not had a seizure in more than three months. [Tr. 32-33].

August 2007 x-ray records in Dr. Wakham's file indicate a "normal looking lumbar spine" with good alignment, disc spaces, and vertebral heights. [Tr. 745]. A lumbar MRI from that same month was not overwhelmingly negative:

FINDINGS: Normal alignment. There is mild disk space narrowing at L4-5 and L5-S1. There is disk desiccation and most prominently at these levels as well. Mild disk bulges are present at L3-4, 4-5, and L5-S1 but there are no focal disk protrusions or significant bony spinal stenosis. Some degenerative facet disease is present at these levels as well. There are no discrete bone or soft tissue masses and the underlying cord is normal in appearance.

[Tr. 746].

In March 2008, Dr. Wakham completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form. [Tr. 618-19]. Therein, Dr. Wakham opined that plaintiff can: occasionally carry no more than five pounds; frequently carry no more than two pounds; and sit and stand no more than four hours each per workday, for one hour at a time. In support of these restrictions, Dr. Wakham cited degenerative lumbar disease. Dr. Wakham predicted additional postural, manipulative, and environmental restrictions, citing seizures and degenerative lumbar disease. Dr. Wakham also completed a mental assessment form, assigning abilities of "fair" and "poor/none" in several categories. [Tr. 621-22]. Although evidence of polysubstance abuse is present in Dr. Wakham's file [Tr. 440, 703], he cited seizures, migraines, degenerative lumbar disease, anxiety, and depression in support of his assessed mental limitations.

In April 2008, plaintiff shot himself in the hand in what he reported to be a pistol-cleaning accident. [Tr. 625]. This incident led to the amputation of a finger on the left hand. [Tr. 679].

14

III.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

15

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).[5]   Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520).  Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id.*

---

[5] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  42 U.S.C. § 1382.  "Disability," for SSI purposes, is defined the same as under § 423.  42 U.S.C. § 1382c(a)(3).

*Analysis*

Plaintiff argues that the ALJ erred by not adopting the severe opinions of treating physician Wakham, and also that he should have been found to satisfy the Commissioner's mental retardation listing. The court will address these issues in turn.

## A. Dr. Wakham

The ALJ rejected Dr. Wakham's assessments because they were "not entirely consistent with the overall evidence of record, including with his own clinical records." [Tr. 18]. There was no error.

As noted, Dr. Wakham's extremely severe predicted physical limitations are based on seizures and lumbar disease. However, multiple lumbar imaging records are present in the file and only one of them suggests any back problems at all - and those problems are essentially described as mild. Lack of objective support and inconsistency with the objective evidence are valid grounds to reject a treating source opinion. *See* 20 C.F.R. § 404.1527(d)(3)-(4). Regarding seizures, plaintiff testified that his medication causes him no problems, and that he had not had a seizure in more than three months. In addition, from the record before the court it is difficult if not impossible to ascertain when plaintiff's seizure and migraine complaints are or are not secondary to polysubstance abuse. [Tr. 293, 312].

Turning to Dr. Wakham's mental health assessment, the ALJ correctly noted that this treating physician is not a mental health professional, and additional psychological

testing was therefore ordered. [Tr. 57]. The ALJ then adopted a mental RFC consistent with the results of the additional testing. [Tr. 14, 49, 789-91]. It is not error to assign greater weight to "a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

In sum, there was no error in the ALJ's RFC conclusions as a whole. He gave "little weight to" the less restrictive assessments of nonexamining Drs. Dascal and Cohn for medium work, "giving the claimant the benefit of the doubt." The ALJ reduced plaintiff to a range of light work, further limited at the left hand to account for the finger amputation. In light of the objective medical record and the absolute unbelievability of plaintiff's statements in general, the ALJ's conclusions are well-supported by substantial evidence.

## B. <u>Mental Retardation</u>

The ALJ concluded that plaintiff suffers from borderline intellectual functioning. [Tr. 12]. Plaintiff argues that he should have instead been found to satisfy the Commissioner's mental retardation listing, which requires in material part that a claimant demonstrate:

> 1. significantly subaverage general intellectual functioning with deficits in adaptive functioning, initially manifested before age 22; and
>
> 2. a valid verbal, performance, or full scale IQ of 60 to 70; and
>
> 3. a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

All of the above criteria must be satisfied. *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001). Plaintiff bears the burden of proof. *Walters*, 127 F.3d at 529. Assuming, without deciding, that plaintiff has a physical or mental impairment that significantly limits his functioning, he has nonetheless failed to meet his burden as to § 12.05C's first and second prongs.

As for the second prong, although testing has twice produced an IQ score facially in the necessary range, each score is suspect. The 2009 testing session was notable for limited effort and likely malingering, causing the examiner to opine that plaintiff may instead "be capable of functioning within the borderline range intellectually," rather than in the mentally retarded range. [Tr. 795]. Mr. Harbison's statement is consistent with the 1986 observation of the Ridgeview counselor and the 2006-2007 observations of Drs. Jethanandani, LeForce, and Gann. [Tr. 232, 351, 497, 568]. The 1983 IQ results are equally suspect. Within three years, a "history of significant" polysubstance abuse was documented and, again, the Ridgeview counselor wrote that plaintiff "appeared to function in the level of low average IQ intellectually," as opposed to mental retardation. [Tr. 232]. As with virtually every issue in this case, it is impossible to tell whether the 1983 IQ results are a function of substance abuse, malingering, or actual impairment.

As for § 12.05C's first prong, plaintiff has failed to show "significantly subaverage general intellectual functioning with deficits in adaptive functioning." *See, e.g., Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126-27 (6th Cir. 2003) (§ 12.05C

not met where a medical source opined that the claimant "was actually operating within the borderline range of intellectual functioning, although her test scores, standing alone, would indicate mental retardation"). Dr. Brietstein, after administering the 1983 IQ test, wrote that "at home and in the community he functions in nearly an age appropriate manner." As noted above, at least five medical sources have opined that plaintiff is likely operating within the borderline range of intellectual functioning.

Further, the court notes that no treatment source of record has ever indicated that plaintiff is a mentally retarded patient - not even Dr. Wakham in his extreme assessment form. The court also observes that plaintiff's adaptive functioning and work history are cumulatively inconsistent with mental retardation. Plaintiff has run his own business, framed houses, hung siding, laid shingles, skied, driven, trimmed trees, raised children, and built stone and brick decking. [Tr. 46, 139, 149, 218, 359, 794]. In sum, the ALJ did not err in concluding that plaintiff suffers from borderline intellectual functioning rather than mental retardation.

## C. Conclusion

The present case highlights just how difficult an ALJ's job can be. The disputed issues on appeal arise from subjective complaints which the claimant criticizes the ALJ for not believing in full. At the same time, the administrative record in this case shows misstatements by the plaintiff at every turn, rendering it most difficult for an adjudicator to determine whether a particular allegation is the result of a true impairment, or the consistent

use of marijuana, or the consumption of "cases" of alcohol, or "binges" of methamphetamine and cocaine abuse. The ALJ's statements from his opinion and the administrative hearing bear repeating. "[T]he claimant has not been entirely truthful with regard to his polysubstance abuse, which detracts from the claimant's general credibility as it calls into question his veracity with regard to his other statements." [Tr. 18-19].

> I'll be honest with you, sir, I'm not sure you're being honest with me today. . . . I'll just tell you flat out I'm not – I don't know you and I'm not wanting to hurt your feelings or be unkind, but I'm not entirely sure you're being credible and that may spill over into other areas as well. That's just – you can see from the record there's some conflicts there.

[Tr. 30].

For the reasons discussed herein, the ALJ's decision was well-explained and supported by substantial evidence. The Commissioner's final decision will be affirmed, and an order consistent with this opinion will be entered.


ENTER:


       s/ Leon Jordan      
United States District Judge